**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **GREGORY STOKES,** | : | **Civ. No. 1:25-CV-1917** |
| **Plaintiff,** | : | |
| | : | **(Judge Wilson)** |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **ELIZABETH JUDD, et al.,** | : | |
| **Defendants.** | : | |

# REPORT AND RECOMMENDATION

## I. Factual Background and Procedural History

Gregory Stokes is an angry man.

Stokes' ire is focused upon his ex-wife Marcia Stokes and those that he sees as aligned with his former spouse. This unrelenting anger manifests itself in a number of ways which touch upon the courts.

In many instances Stokes' rage has led him to become a criminal defendant. Indeed, Stokes has been convicted on numerous occasions of criminal conduct targeting his estranged spouse. Initially a protection from abuse order was entered against the plaintiff on April 29, 2024, in the Court of Common Pleas of Cumberland County. In short order, Stokes violated this order on three occasions, pleading guilty or nolo contendere to Indirect Criminal Contempt on June 11, 2024, August 6, 2024, and September 10, 2024. See Commonwealth v. Gregory Stokes, CP-21-MD-

0000380-2024; Commonwealth v. Gregory Stokes, CP-21-MD-0000484-2024; Commonwealth v. Gregory Stokes, CP-21-MD-0000663-2024. (Docs. 55-1 through 55-3).

Despite these three contempt citations, Stokes continued to target his ex-wife. In July of 2024, Stokes was charged in the Court of Common Pleas of Dauphin County with stalking and harassment. On November 5, 2025, Stokes pled nolo contendere to one count of felony stalking and one count of misdemeanor harassment for this criminal misconduct directed at his ex-wife. Commonwealth v. Gregory Stokes, CP-22-CR-0002897-2024. (Doc. 55-4). Stokes also turned to various forms of civil lawfare aimed at his ex-wife and those he perceived as supporting her. Stokes has sued his estranged former spouse multiple times in state and federal court. These efforts to use civil litigation to punish his ex-wife have, for the most part, been unavailing[1]

---

[1] For example, Stokes filed a complaint in the Middle District of Pennsylvania against his ex-wife on November 10, 2025. Stokes v. Stokes, Civil No. 1:25-CV-2121. This complaint was dismissed on April 10, 2026. Stokes also sued his wife's divorce attorney in federal court but abandoned this case after it was recommended that the complaint be dismissed. Stokes v. Cognetti, Civil No.1:25-CVC-1428. In addition, Stokes, acting on behalf of himself or his mother, Janet Stokes, filed two actions against Dr. Stokes: one in Cumberland County Court of Common Pleas, Docket No. 2026-04311, and in Indiana County Court of Common Pleas, Docket No. 1548-CD-2025-1.The Indiana County matter was discontinued on April 9, 2026. (Docs. 55-4 through 55-7).

It is against this backdrop of focused fury targeting his ex-wife that the instant case comes before us for consideration of various motions to dismiss. (Docs. 8, 30, 41, 55). Gregory Stokes' *pro se* complaint in this case arises out of his state court guilty and nolo plea contempt convictions in Cumberland County following his violations of the protection from abuse (PFA) order entered by that court. In his complaint, Stokes sues his ex-wife, Marcia Stokes, for reporting his contumacious behavior to polices. Stokes then sues the police officer who arrested him and the assistant district attorney who convicted him of these criminal contempts. Stokes also sues the magisterial district judge who presided over aspects of his contempt cases for his judicial acts. Finally, Stokes names his wife's employer, the Harrisburg School District, as a defendant, apparently based upon the notion that the school district should have established policies that would have prevented his wife from reporting his criminal conduct to the police. (Doc. 1).

Ignoring his own nolo and guilty plea convictions, Stokes insists that these defendants conspired together to violate his rights by retaliating against him, falsely arresting him, and maliciously prosecuting him. (Id.) Stokes' complaint also brings companion state law malicious prosecution, false arrest, defamation, fraud and intentional infliction of emotional distress claims against the defendants. (Id.) On the basis of these allegations, Stokes demands compensatory damages of $1,000,000, punitive damages and sweeping injunctive and declaratory relief. (Id.)

The defendants have moved to dismiss this complaint, citing numerous flaws in this pleading. (Docs. 8, 30, 41, 55). These motions are now ripe for resolution.

For the reasons set forth below, it is recommended that the motions to dismiss be granted and the amended complaint be dismissed.

## II. Discussion

### A. Motion to Dismiss—Standard of Review

A motion to dismiss tests the legal sufficiency of a complaint. It is proper for the court to dismiss a complaint in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure only if the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). With respect to this benchmark standard for legal sufficiency of a complaint, the United States Court of Appeals for the Third Circuit has aptly noted the evolving standards governing pleading practice in federal court, stating that:

> Standards of pleading have been in the forefront of jurisprudence in recent years. Beginning with the Supreme Court's opinion in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), continuing with our opinion in Phillips [v. County of Allegheny, 515 F.3d 224, 230 (3d Cir. 2008)], and culminating recently with the Supreme Court's decision in Ashcroft v. Iqbal, BU.S.B, 129 S. Ct. 1937 (2009), pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss.

Fowler v. UPMC Shadyside, 578 F.3d 203, 209-10 (3d Cir. 2009).

In considering whether a complaint fails to state a claim upon which relief

may be granted, the court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. Jordan v. Fox, Rothschild, O'Brien & Frankel, Inc., 20 F.3d 1250, 1261 (3d Cir. 1994). However, a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997). Additionally, a court need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 526 (1983). As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), in order to state a valid cause of action, a plaintiff must provide some factual grounds for relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of actions will not do." Id. at 555. "Factual allegations must be enough to raise a right to relief above the speculative level." Id.

In keeping with the principles of Twombly, the Supreme Court has underscored that a trial court must assess whether a complaint states facts upon which relief can be granted when ruling on a motion to dismiss. In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Supreme Court held that, when considering a motion to dismiss, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 679.

According to the Supreme Court, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. Rather, in conducting a review of the adequacy of a complaint, the Supreme Court has advised trial courts that they must:

> [B]egin by identifying pleadings that because they are no more than conclusions are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id. at 679.

Thus, following Twombly and Iqbal, a well-pleaded complaint must contain more than mere legal labels and conclusions; it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. As the United States Court of Appeals for the Third Circuit has stated:

> [A]fter Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

Fowler, 578 F.3d at 210-11.

As the Court of Appeals has observed:

> The Supreme Court in Twombly set forth the "plausibility" standard for overcoming a motion to dismiss and refined this approach in Iqbal. The plausibility standard requires the complaint to allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570, 127 S. Ct. 1955. A complaint satisfies the plausibility standard when the factual pleadings "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S. Ct. at 1949 (citing Twombly, 550 U.S. at 556, 127 S. Ct. 1955). This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully." Id. A complaint which pleads facts "merely consistent with" a defendant's liability, [ ] "stops short of the line between possibility and plausibility of 'entitlement of relief.' "

Burtch v. Milberg Factors, Inc., 662 F.3d 212, 220-21 (3d Cir. 2011), cert. denied, 132 S. Ct. 1861, 182 L.Ed.2d 644 (2012).

In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis: "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' Iqbal, 129 S. Ct. at 1947. Second, the court should identify allegations that, 'because they are no more than conclusions, are not entitled to the assumption of truth.' Id. at 1950. Finally, 'where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.' Id." Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010).

In considering a motion to dismiss, the court generally relies on the complaint, attached exhibits, and matters of public record. Sands v. McCormick, 502 F.3d 263, 268 (3d Cir. 2007). The court may also consider "undisputedly authentic document[s] that a defendant attached as an exhibit to a motion to dismiss if the

plaintiff's claims are based on the [attached] documents." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Moreover, "documents whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002); see also U.S. Express Lines, Ltd. v. Higgins, 281 F.3d382, 388 (3d Cir. 2002) (holding that "[a]lthough a district court may not consider matters extraneous to the pleadings, a document integral to or explicitly relied upon in the complaint may be considered without converting the motion to dismiss in one for summary judgment"). However, the court may not rely on other parts of the record in determining a motion to dismiss, or when determining whether a proposed amended complaint is futile because it fails to state a claim upon which relief may be granted. Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

It is against these legal guideposts that we assess the sufficiency of the plaintiff's claims.

**B. The Motion to Dismiss Should Be Granted**

In this case, Stokes' complaint is profoundly flawed in multiple respects. The fatal deficiencies in this pleading, which compel dismissal of the complaint, are addressed separately below.

1. **Stokes' Nolo and Guilty Plea Convictions Checkmate His Claims Arising Out of These State Prosecutions**

a. **Stokes May Not Collaterally Challenge his State Criminal Convictions**

At the outset, the stubborn fact that Stokes stands convicted of these contempt citations based upon his *nolo contendere* and guilty pleas defeats the plaintiff's Constitutional claims. Under controlling Supreme Court holdings, Stokes' current civil false arrest and malicious prosecution claims necessarily imply the invalidity of these *nolo* and guilty plea convictions. This he may not do.

As the Third Circuit has explained:

> In Heck v. Humphrey, the Supreme Court announced that a plaintiff cannot attack the validity of his conviction or sentence in a § 1983 damages action without proving that the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254." 512 U.S. at 486–87, 114 S.Ct. 2364. Heck determined that this requirement emanated from § 1983 itself. Recognizing that § 1983 creates a particular kind of liability for constitutional torts, the Court turned to common-law tort principles to inform its interpretation of the federal civil rights statute. It first concluded that the common-law tort of malicious prosecution "provides the closest analogy" to § 1983 claims for damages predicated on the unconstitutionality of a conviction or sentence. Id. at 484, 114 S.Ct. 2364. That being so, § 1983 claims of this sort, like the common-law cause of action for malicious prosecution, require a showing that the prior criminal proceeding terminated in the plaintiff's favor.

Deemer v. Beard, 557 F. App'x 162, 164–65 (3d Cir. 2014)

Thus, the Third Circuit has affirmed dismissal of false arrest and false

imprisonment claims under Heck where success on those claims would conflict with the prior judicial resolution of the criminal proceedings. See Bressi v. Brennen, 823 F. App'x 116, 119 (3d Cir. 2020) ("[B]ecause [the plaintiff's] claims amount to challenges to the validity of his convictions, and because those convictions do not appear to have been invalidated, the claims are barred by Heck). In particular, under Heck a plaintiff's prior guilty plea is sufficient to bar a subsequent false arrest or malicious prosecution claim. See e.g., Ferris v. Borough of Baldwin, 247 F. Supp. 3d 671, 681 (W.D. Pa. 2017); Rosembert v. Borough of E. Lansdowne, 14 F. Supp. 3d 631, 640 (E.D. Pa. 2014) (citing Gilles v. Davis, 427 F.3d 197, 209 n. 8 (3d Cir.2005)); Walthour v. Miller, 795 F. Supp. 2d 317, 325 (E.D. Pa. 2011). Moreover, under Heck, "the fact that his conviction came about as a result of a nolo contendere plea, as opposed to a guilty plea or a jury verdict, is of no moment." Moser v. Bascelli, 879 F. Supp. 489, 493 (E.D. Pa.), aff'd, 70 F.3d 1256 (3d Cir. 1995) (citing Olsen v. Correiro, No. 92–10961, 1994 WL 548111, at *4, 1994 U.S.Dist. LEXIS 13803, at *12 (D.Mass. Sept. 26, 1994) ("It makes no difference that the criminal judgment here was rendered pursuant to a nolo plea; its effect is the same as if [plaintiff] had pled guilty.")). As the Third Circuit has observed:

> [U]nder Pennsylvania law, [a nolo contendere] plea must be treated the same as a conviction under Heck. See United States v. Poellnitz, 372 F.3d 562, 566 (3d Cir. 2004) ("[A] nolo plea is indisputably tantamount to a conviction...."). Even though Pennsylvania law does not treat a nolo contendere as an admission of guilt, it is "equivalent to a plea of guilty" and the defendant "consents to being punished as if he were guilty." Id.

> at 568 (citing Commonwealth v. Gunter, 565 Pa. 79, 771 A.2d 767, 773 (2001) (quotation marks omitted)). A nolo contendere plea " 'cannot be used against the defendant as an admission in any civil suit for the same act,' " but the judgment of conviction still follows from it, just like a plea of guilty. Id. (quoting Eisenberg v. Commonwealth, 512 Pa. 181, 516 A.2d 333, 335 (1986)).

Curry v. Yachera, 835 F.3d 373, 378 (3d Cir. 2016).

In this case, Stokes pleaded guilty or entered a *nolo contendere* plea to the contempt charges which he now seeks to undermine in this civil case. On these facts, Stokes' false arrest and malicious prosecution claims rule afoul of Heck's favorable termination rule. Since Stokes has not attained a favorable termination of these criminal charges but rather stands convicted on his own plea in each of these cases, these civil claims which challenge the validity of his prior state convictions are barred.

**b. Probable Cause Existed to Arrest Stokes**

In addition, any false arrest claim fails because it is clear that the police had probable cause to arrest Stokes. In order to make out a false arrest claim, a plaintiff must demonstrate that police lacked probable cause to arrest. Groman v. Twp. of Manalapan, 47 F.3d 628, 634 (3d Cir. 1995). Thus, proof that probable cause was lacking is essential to any § 1983 claim arising out of the arrest or detention of an individual. For purposes of the Fourth Amendment, probable cause to arrest exists "whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to

conclude that an offense has been committed by the person being arrested." U.S. v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). An arrest by a police officer without a warrant "is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." Devenpeck v. Alford, 543 U.S. 146, 152 (2004). In conducting an inquiry into whether probable cause to arrest existed, a court should consider the totality of the circumstances presented, and "must assess the knowledge and information which the officers possessed at the time of arrest, coupled with the factual occurrences immediately precipitating the arrest." United States v. Stubbs, 281 F.3d 109, 122 (3d Cir. 2002).

Although "[t]he probable-cause standard is incapable of precise definition or quantification," Maryland v. Pringle, 540 U.S. 366, 371 (2003), all interpretations of probable cause require "a belief of guilt that is reasonable as opposed to certain." Wright v. City of Philadelphia, 409 F.3d 595, 602 (3d Cir. 2005) (citing Hill v. California, 401 U.S. 797, 804 (1971)). Probable cause "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." Wright, 409 F.3d at 602 (quoting Adams v. Williams, 407 U.S. 143, 149 (1972)). Accordingly, the evidentiary standard for probable cause is significantly lower than that required for conviction. Id. (citing Michigan v. DeFillippo, 443 U.S. 31, 36 (1979)); see also Wilson v. Russo, 212 F.3d 781, 789

(3d Cir. 2000) (holding that probable cause requires only a "fair probability" that a person committed the relevant crime). Because an arrest is made with probable cause if at the moment it was made the facts and circumstances within the officer's knowledge "were sufficient to warrant a prudent man in believing that [the suspect] had committed or was committing an offense," Beck v. Ohio, 379 U.S. 89, 91 (1964), the constitutional validity of an arrest does not turn on whether the suspect actually committed any crime. Johnson v. Campbell, 332 F.3d 199, 211 (3d Cir. 2003).

In this case, the affidavit submitted by police, (Doc. 32-1 at 58), reveals that Stokes twice admitted to officers that he had engaged in conduct which violated the protection from abuse order. These admissions were plainly sufficient to establish probable cause to believe that Stokes was in contempt and police, prosecutors and the court justifiably relied upon these admissions when making probable case determinations in Stokes' state cases.

**c. The Defendants Are Entitled to Qualified Immunity**

Further, given the fact that probable cause existed to arrest Stokes, and his subsequent *nolo* and guilty pleas confirmed his contumacious conduct that probable cause existed, it appears the defendants are also entitled to qualified immunity on these claims. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Reichle v. Howards, 566 U.S.

658, 664 (2012). A qualified immunity analysis involves two questions: whether the official violated a statutory or constitutional right, and whether that right was clearly established at the time of the challenged conduct. Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011). Lower courts have the discretion to decide which question to analyze first. Pearson v. Callahan, 555 U.S. 223, 236 (2009). The Supreme Court has cautioned courts to "think carefully before expending scarce judicial resources to resolve difficult and novel questions of constitutional or statutory interpretation that will have no effect on the outcome of the case." Id. (internal quotations omitted); see also al-Kidd, 563 U.S. at 735.

An official's conduct violates clearly established law when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" al-Kidd, 563 U.S. at 741 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). The Supreme Court has stated that this standard does not require a case directly on point, but requires that "existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 563 U.S. at 741. "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." Id. at 743 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)); see also Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015).

The dispositive question that the court must ask is "whether the violative

nature of *particular* conduct is clearly established." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting al-Kidd, 563 U.S. at 742). The inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id.; see also Davenport v. Borough of Homestead, 870 F.3d 273, 281 (3d Cir. 2017). This "clearly established" standard ensures that an official can reasonably anticipate when his or her conduct may give rise to liability, and "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties." Reichle, 566 U.S. at 664.

For claims of false arrest, "the defendants are entitled to qualified immunity . . . if a reasonable officer could have believed that probable cause existed to arrest [the plaintiff] in light of clearly established law and the information the [arresting] officers possessed." Blaylock v. City of Philadelphia, 504 F.3d 405, 411 (3d Cir. 2007) (quoting Hunter v. Bryan, 502 U.S. 224, 228-29 (1991) (internal quotations omitted). Here it is evident that the defendants could have reasonably concluded that probable cause existed to charge and arrest Stokes for violating a state court PFA order. Indeed, at one time Stokes conceded these violations in the course of his *nolo* and guilty pleas. Given these stubborn facts, the defendants are, at a minimum, entitled to qualified immunity and Stokes' claims should be dismissed.

**2. Stokes May Not Sue the Complaining Witness in His State Case for Civil Rights Violations.**

Viewed in its proper factual context, Stokes' civil rights claims against his ex-

wife, Marcia Stokes, have an astonishing element of hubris and unwonted entitlement. Stokes was charged with contumacious harassment of his former spouse. He entered guilty and *nolo contendere* pleas to these charges acknowledging his criminal conduct. Thus, Marcia Stokes' role in this matter was that of a complaining witness, who reported crimes to police that her ex-husband Gregory Stokes later acknowledged committing.

Now, Gregory Stokes seeks to sue this complaining witness for reporting his admitted criminal conduct to the police. This he may not do. To the extent that Stokes is attempting to sue his ex-wife because she provided information to the police and was a putative witness in Stokes' state criminal case, this claim fails for a simple reason: witnesses enjoy immunity from liability under the federal civil rights statutes. As the Supreme Court has explained:

> [A] trial witness has absolute immunity with respect to *any* claim based on the witness' testimony. When a witness is sued because of his testimony, . . . , " 'the claims of the individual must yield to the dictates of public policy.' " Without absolute immunity for witnesses, . . ., the truth-seeking process at trial would be impaired. Witnesses "might be reluctant to come forward to testify," and even if a witness took the stand, the witness "might be inclined to shade his testimony in favor of the potential plaintiff" for "fear of subsequent liability."

Rehberg v. Paulk, 566 U.S. 356, 367 (2012) (citations omitted, emphasis in original). Therefore, any federal civil rights claims premised upon Marcia Stokes' alleged status as a complaining witness in Gregry stokes' state criminal case also fail as a matter of law and should be dismissed.

**3. The Judge Named in the Complaint is Immune from Liability.**

Additionally, in this complaint Stokes attempts to sue a magisterial district judge for judicial acts undertaken by the judge in his PFA case. To the extent that the plaintiff seeks in this complaint to hold this judge personally liable for civil rights violations, based upon an alleged failure to act favorably in ruling upon a prior criminal case, it is well settled that the judge is individually cloaked with immunity from liability.

The United States Supreme Court has long recognized that those officials performing judicial, quasi-judicial, and prosecutorial functions in our adversarial system must be entitled to some measure of protection from personal liability for acts taken in their official capacities. In order to provide this degree of protection from liability for judicial officials, the courts have held that judges, Mireless v. Waco, 502 U.S. 9, 13 (1991); prosecutors, Imbler v. Pachtman, 424 U.S. 409, 427 (1976); and those who perform adjudicative functions, Imbler, 424 U.S. at 423 n. 20 (grand jurors); Harper v. Jeffries, 808 F.2d 281, 284 (3d. Cir.1986) (parole board adjudicators); are entitled to immunity from personal liability for actions they take in our adversarial system of justice.

These longstanding common law immunities apply here and prevent Stokes from maintaining this civil action against the judge named in this complaint since the judge is entitled to judicial immunity for his actions in these prior proceedings

and is absolutely immune from personal liability for any judicial acts. See, e.g., Arsad v. Means, 365 F. App'x 327 (3d Cir.2010); Figueroa v. Blackburn, 208 F.3d 435 (3d Cir. 2000). As we have explained when rejecting similar efforts to impose personal civil rights liability on a judge, this immunity is both broad and absolute:

> "It is a well-settled principle of law that judges are generally 'immune from a suit for money damages.' " Figueroa v. Blackburn, 208 F.3d 435, 440 (3d Cir.2000) (quoting Mireles v. Waco, 502 U.S. 9, 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991) (per curiam), and citing Randall v. Brigham, 74 U.S. (7 Wall.) 523, 536, 19 L.Ed. 285 (1868)). "The doctrine of judicial immunity is founded upon the premise that a judge, in performing his or her judicial duties, should be free to act upon his or her convictions without threat of suit for damages." Id. (citations omitted). Therefore, "[a] judge is absolutely immune from liability for his [or her] judicial acts even if his [or her] exercise of authority is flawed by the commission of grave procedural errors," Stump v. Sparkman, 435 U.S. 349, 359, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978), and "[j]udicial immunity cannot be overcome by allegations of bad faith or malice" Goldhaber v. Higgins, 576 F.Supp.2d 694, 703 (W.D.Pa.2007). Such immunity can be overcome only where a judge's acts are nonjudicial in nature, or where such actions, while judicial in nature, are "taken in the complete absence of all jurisdiction." Mireles, 502 U.S. at 12.

Catanzaro v. Collins, CIV. A. 09–922, 2010 WL 1754765 (M.D. Pa. Apr. 27, 2010), aff'd, 447 F. App'x 397 (3d Cir. 2011). As the Third Circuit has further explained:

> A judicial officer in the performance of his or her duties has absolute immunity from suit. Simply put, "[a] judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all

jurisdiction.'"

Kwasnik v. Leblon, 228 F. App'x 238, 243 (3d Cir. 2007) (quoting Stump v. Sparkman, 435 U.S. 349, 356–57 (1978) (citations omitted)).

This judicial immunity applies to Section 1983 civil rights actions like the lawsuit brought here, see Dennis v. Sparks, 449 U.S. 24, 27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), and embraces both requests for damages, as well as costs and attorney's fees. See Corliss v. O'Brien, No. 3:05–CV–0347, 2005 WL 2334792 (M.D. Pa. 2005), aff'd, 200 F.App'x. 80 (3d Cir. 2006). This judicial immunity also expressly extends to Pennsylvania magisterial district court judges. Indeed, as the United States Court of Appeals for the Third Circuit has aptly observed, there is no distinction "between judges of courts of limited and general jurisdiction" when applying the judicial immunity doctrine, Figueroa v. Blackburn, 208 F.3d 435, 441 (3d Cir. 2000), and "[t]he doctrine of judicial immunity applies equally to courts of limited jurisdiction, such as district justices, as to courts of general jurisdiction." Martin v. Bicking, 30 F.Supp.2d 511, 512 (E.D. Pa. 1998); see also Schuler v. City of Chambersburg, 641 F.Supp. 657, 659 (M.D. Pa. 1986); Horne v. Farrell, 560 F.Supp. 219, 222–23 (M.D. Pa. 1983). Moreover, this judicial immunity specifically applies to judicial actions ruling on bail requests, making probable cause determinations, and presiding over preliminary hearings in state criminal cases. See, e.g., Williams v. McCleaf, No. 1:19-CV-85, 2019 WL

472311, at *5 (M.D. Pa. Jan. 17, 2019), report and recommendation adopted, No. 1:19-CV-0085, 2019 WL 462128 (M.D. Pa. Feb. 6, 2019); Pokrandt v. Shields, 773 F.Supp. 758 (E.D. Pa. 1991); Fox v. Castle, 771 F.Supp. 411 (M.D. Pa. 1977).

In the instant case, it is evident that Stokes is endeavoring to sue the judge for what the plaintiff perceives to be wrongful judicial actions, but the fact remains that the conduct alleged by Stokes consisted of judicial actions that lay within the court's jurisdiction. Therefore, this conduct is cloaked in judicial immunity, and the magisterial district judge should be dismissed as a defendant.

**4. Stokes Has Failed to State any Monell Liability Claims Against the Harrisburg School District**

Stokes' complaint also names his ex-wife's employer, the Harrisburg School District, as a defendant and grounds this institutional liability claim on a single, peculiar factual averment. As we understand it, Stokes believes that the school district is somehow liable for his arrest and convictions because it did not have policies in place that would have prevented Marcia Stokes from reporting his misconduct to law enforcement. This frivolous averment lays bare Stokes' attempt to impute liability upon the school district simply by virtue of the actions of his former spouse.

This he may not do. In fact, it is well settled that local governmental entities may not be held liable under § 1983 for the acts of others under a theory of *respondeat superior* or vicarious liability. Iqbal, 556 U.S. 662; see also Colburn

v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991). Instead, such an agency may only be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978).

Thus, to sustain a claim against this institutional defendant, a plaintiff must "identify a . . . policy or custom that caused the plaintiff's injury." Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997) (quotations omitted). A plaintiff can adequately allege a policy or custom establishing institutional liability for the acts committed by its employees by showing a formal policy, a specific injury-causing action taken by a government official, a practice so widespread it had become a custom, or a widespread failure to train or supervise subordinates. See Ashley v. Kosehba, No. 1:22-CV-00982, 2023 WL 6200805, at *4 (M.D. Pa. Sept. 22, 2023). Once this policy or custom has been established, the plaintiff must also allege "that it was the proximate cause of his injuries by demonstrating a plausible nexus or affirmative link between the municipality's policy or custom and the specific harm sustained." Hargrove v. City of Philadelphia, No. CV 21-4082, 2023 WL 3229927, at *6 (E.D. Pa. May 3, 2023) (citing Bielevicz

v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990); Est. of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019)) (quotations omitted).

Stokes' complaint plainly does not meet this standard of pleading necessary for institutional civil rights liability. There is no causal relationship between the district and Stokes' criminal cases; in fact, beyond his fevered speculation there is no indication that the school district had any involvement whatsoever in these criminal cases. Therefore, any institutional liability claims also fail.

**5. Stokes Has Failed to Properly Serve Defendant Judd.**

Stokes commenced this case in October of 2025. (Doc. 1). While Stokes sought entry of a default judgement against Defendant Judd on November 24, 2025, (Doc. 13), Judd resisted this motion by noting that Stokes never made service upon her. (Doc. 16). On December 12, 2025, the Court agreed that service had not been made upon Judd and ordered Stokes to make proper service by February 3, 2026, while admonishing Stokes that the failure to make timely service could lead to the dismissal of this complaint. (Doc. 24). Despite the admonition, there is no record of proper service upon Defendant Judd and the time for service of the complaint has now passed.

On these facts dismissal of this pleading with respect to Defendant Judd is now warranted. Simply put, the failure to properly serve this filing now compels this outcome under the Federal Rules of Civil Procedure. In particular, this result is

mandated by Rule 4 of the Federal Rules of Civil Procedure, which prescribes the method by which service can be made and describes how a party must demonstrate proof of service on the record. See Fed. R. Civ. P. 4(a)-(l). Rule 4 also sets time limits for service and prescribes the sanction of dismissal for the failure to make proper and timely service, stating as follows:

> **(m) Time Limit for Service.** If a defendant is not served within 90 days after the complaint is filed, the court--on motion or on its own after notice to the plaintiff--must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).

The language of Rule 4(m) is both clear and mandatory. Where there is an unjustified and unexcused failure to timely serve a complaint, the court "must dismiss the action." Id. As a general rule, "the party asserting the validity of service bears the burden of proof on that issue." Grand Entertainment Group, Ltd. v. Star Media Sales, Inc., 988 F.2d 476, 488 (3d Cir. 1993) (citing 4A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 1083 (1987)). When the plaintiff fails to carry this burden of proof on the issue of proper and timely service, consistent with Rule 4(m)'s mandate that the "court—on motion or on its own after notice to the plaintiff—must dismiss the action," dismissal of the case is entirely appropriate. Indeed, when a plaintiff does not show good cause for a failure to serve, Beckerman v. Susquehanna Township Police, 254 F. App'x 149, 154 (3d Cir. 2007),

or fails to make service, despite warnings and requests by the court to address service issues, Foster v. Pennsylvania Human Relations Comm'n, 157 F. App'x 488, 490 (3d Cir. 2005), courts have frequently dismissed actions for failure to make service.

These principles control here and call for dismissal of this action with respect to Defendant Judd for failure to make timely and proper service. In this case, in December of 2025, the Court gave Stokes specific and explicit instructions regarding the need to make service by February of 2026 while warning him that dismissal would be the sanction for failing to serve the complaint. Nonetheless, the plaintiff has not complied with this order, has provided no proof of proper service, and more than 90 days have passed since the entry of this order. Given this cascading array of failures, dismissal is appropriate here. Beckerman, 254 F. App'x at 154 (affirming dismissal for failure to serve two days after service deadline elapsed where no good cause shown).

We also note that Stokes' complaint names Assistant District Attorney Judd and appears to sue Judd simply because she prosecuted him for the crimes he acknowledged committing. This claim fails on its merits since it is well-settled that a criminal defendant may not sue a prosecutor for the act of filing charges against him since such conduct is cloaked in immunity from civil liability. The immunity conferred upon prosecutors for the quasi-judicial act of filing and bringing criminal charges is also broad and sweeping:

> [T]he Supreme Court [has] held that state prosecutors are absolutely immune from liability under § 1983 for actions performed in a quasi-judicial role. This immunity extends to acts that are "intimately associated with the judicial phase of the criminal process," such as "initiating a prosecution and ... presenting the State's case." [The] Court has noted numerous public policy considerations underlying its extension of absolute immunity to prosecutors: [S]uits against prosecutors for initiating and conducting prosecutions "could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate"; lawsuits would divert prosecutors' attention and energy away from their important duty of enforcing the criminal law; prosecutors would have more difficulty than other officials in meeting the standards for qualified immunity; and potential liability "would prevent the vigorous and fearless performance of the prosecutor's duty that is essential to the proper functioning of the criminal justice system." ... [T]here are other checks on prosecutorial misconduct, including the criminal law and professional discipline.

Yarris v. County of Delaware, 465 F.3d 129, 135 (3d Cir. 2006) (citations omitted). Thus, to the extent that the complaint seeks to hold this prosecutor personally liable for bringing a criminal case against Stokes, Defendant Judd is immune from personal, individual liability and these claims should be dismissed.

### 6. Stokes' Section 1985(3) Conspiracy Claim Fails

In an attempt to stitch the disparate threads of his complaint into a coherent whole Stokes also alleges that all of the defendants conspired to deprive him of his civil rights in violation of 42 U.S.C. § 1985(3).

This claim fails. On this score 42 U.S.C. § 1985(3) provides that:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose

> of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ..., the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

The reach of § 1985(3) has also been carefully defined by the courts. As the United States Court of Appeals for the Third Circuit has observed, "in Griffin v. Breckenridge, 403 U.S. 88 (1971) . . ., the Supreme Court clarified that the reach of section 1985(3) is limited to private conspiracies predicated on 'racial, or perhaps otherwise class based, invidiously discriminatory animus.' Id. at 102." Lake v. Arnold, 112 F.3d 682, 685 (3d Cir.1997). Thus:

> Section 1985(3) permits an action to be brought by one injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). In a line of cases ..., the Supreme Court has made clear what a plaintiff must allege to state a claim under § 1985(3): "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828–29,(1983) (citing Griffin, 403 U.S. at 102–03).

Farber v. City of Paterson, 440 F.3d 131, 134 (3d. Cir. 2006); See Lake v. Arnold, 112 F.3d 682, 685 (3d Cir.1997). "[B]ecause § 1985(3) requires the 'intent to deprive of *equal* protection, or *equal* privileges and immunities,' a claimant must

allege 'some racial, *or perhaps otherwise class-based,* invidiously discriminatory animus behind the conspirators' action' in order to state a claim." Farber, 440 F.3d at 135 (citations omitted, emphasis in original).

In this case, Stokes' complaint is devoid of any well-pleaded facts which would support a claim of a collective racial or class-based invidious discriminatory animus by the curious array of defendants named by Stokes in his complaint. Quite the contrary, the well-pleaded facts seem to show nothing more than the prosecution of Stokes for contumacious acts which he concedes he committed. Since Stokes' § 1985(3) conspiracy claim fails to allege facts which satisfy the elements of the statute this claim also fails and should be dismissed.

**7. Any Supplemental State Law Claims Should Be Dismissed.**

The dismissal of these federal claims dictates the appropriate course we should follow in addressing the ancillary state law claims that the plaintiff may wish to pursue. In a case such as this, where the jurisdiction of the federal court was premised on alleged federal claims which are found to be subject to dismissal at the outset of litigation, the proper course generally is for "the court [to] decline to exercise supplemental jurisdiction over the plaintiff's state law claims." Bronson v. White, No. 05-2150, 2007 WL 3033865, *13 (M.D. Pa. Oct. 15, 2007) (Caputo, J.) (adopting report and recommendation dismissing ancillary malpractice claim against dentist) (citing 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise

supplemental jurisdiction over a claim under subsection (a) if- ... the district court has dismissed all claims over which it has original jurisdiction."); United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) (holding that when federal causes of action are dismissed, federal courts should not separately entertain pendent state claims)). See also Ham v. Greer, 269 F. App'x 149, 151 (3d Cir. 2008) (citing United Mine Workers, 383 U.S. at 726; Tully v. Mott Supermkts., Inc., 540 F.2d 187, 196 (3d Cir. 1976)) ("Because the District Court appropriately dismissed [the inmate's] Bivens claims, no independent basis for federal jurisdiction remains"). As the Supreme Court has aptly observed:

> Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers, 383 U.S. at 726 (footnotes omitted).

Therefore, in the exercise of our discretion, we should decline to assert supplemental jurisdiction over potential ancillary state law claims in this case where all potential federal claims brought before us fail as a matter of law. See Payne v. Doe #1, No. 1:22-CV-1876, 2023 WL 3493315, at *5–6 (M.D. Pa. Mar. 27, 2023), report and recommendation adopted, No. 1:22-CV-1876, 2023 WL 3480895 (M.D. Pa. May 16, 2023).

### III. **Recommendation**

Accordingly, for the foregoing reasons, IT IS RECOMMENDED as follows:

1. The Defendants' Motions to Dismiss, (Docs. 8, 30, 41, 55), should be GRANTED;
2. Defendant Judd should be dismissed pursuant to Rule 4 of the Federal Rules of Civil Procedure; and
3. This case should be CLOSED.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses, or recommit the matter to the magistrate judge with instructions.

Submitted this 11th day of August 2026.

*S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge